[L.A. No. 29831. In Bank. July 8, 1971.]

EVA M. KERR, Plaintiff and Appellant, v.
GUSTAVUS BOCK, Defendant and Respondent.

COUNSEL

O'Rourke & Greenberg, David Greenberg, William Jerome Pollack, Joel F. Citron and David H. Olson for Plaintiff and Appellant.

Bonne & Jones and H. Gilbert Jones for Defendant and Respondent.

OPINION

McCOMB, J.—Plaintiff appeals from a judgment in favor of defendant in a medical malpractice action.

*Facts:* Plaintiff, a 67-year old woman in generally good health, consulted a doctor because of a pain in her left leg. X-rays revealed a tumor on her left femur, and the radiologist diagnosed probable osteogenic sarcoma. A biopsy was scheduled. During the surgery, performed by defendant February 7, 1963, a portion of the bone was removed. Subsequent tests revealed that the tumor was not malignant, but that fact was not known at the time of the surgery.

There is a conflict in the evidence as to how much of the bone defendant removed. He testified that he removed "approximately one-fourth of the circumference of the bone and in length approximately two inches." According to plaintiff's testimony, defendant told her after the operation that a third of the bone had been removed. Plaintiff's medical expert gave an opinion that, based on his examination of X-rays and pathology reports, 50 percent to 57 percent of the circumference of the bone was removed, and he testified that the removal of more than 33⅓ percent without providing internal or external support was not the exercise of proper care by a surgeon performing a bone tumor removal from the femur.

No internal fixation device was implanted in the bone to strengthen the weakened femur. Defendant testified that he decided against the use of such a device, because if malignancy existed, implanting such a device would tend to spread the malignant cells. He further testified that he decided against the use of a cast because of the danger of certain complications (mainly pneumonia, pulmonary embolism from blood clots, kidney stones, general muscular atrophy, and general loss of calcium throughout the entire skeletal structure, since the cast would have extended from the patient's breast to, and encasing, the feet). Defendant's experts testified that the use of some type of fixation device or a cast or a type of bed rest was required when 33⅓ percent or more of the bone was removed. Defendant himself testified that a cast was definitely required where 33⅓ percent of the bone was removed, whether there was malignancy or not.

While still in the hospital, plaintiff was furnished with crutches, and before leaving was instructed by defendant to use them at all times and to "be careful and not [sic] put only a little weight on the leg." Plaintiff was aware that the bone had been weakened by the operation and that she would have to be careful. Defendant testified, in part, that he had "told her that she was to use crutches at all times, with minimal weight bearing, bearing the weight of her extremity only, just the weight of touching it down on the floor; that she was to be very careful and avoid any injury, any violent motions; that this bone could fracture if she sustained an injury." There is no evidence, however, that defendant warned plaintiff that there was danger in *lifting* her leg in order to place her feet on the floor when she had been in a reclining position.

Plaintiff was discharged from the hospital February 13. The following day, she was lying on a sofa watching television. In attempting to rise, she lifted her left leg "just a little," and it fractured at the site of the operation. She was returned to the hospital; and, it having been determined by this time that the tumor was benign, defendant performed another operation, in which he placed an intramedullary nail into the bone. In June 1964, the nail was removed. Plaintiff's only complaint of permanent disability is that when she walks quite a bit, she gets tired and feels an ache in her leg.

Plaintiff requested that the trial court instruct the jury on the doctrine of res ipsa loquitur, but the trial court refused to do so. Thereafter, the jury returned a verdict in favor of defendant.

Question: *Was plaintiff entitled to a res ipsa loquitur instruction on the basis of common knowledge among laymen that plaintiff's injuries would ordinarily not have occurred in the absence of someone's negligence?*

*Yes.* In determining whether plaintiff was entitled to the benefit

of the res ipsa loquitur doctrine, the evidence must be viewed in the light most favorable to her (*Farber* v. *Olkon,* 40 Cal.2d 503, 505 [254 P.2d 520].) So viewing the evidence, we find that a res ipsa instruction should have been given.

In *Clark* v. *Gibbons,* 66 Cal.2d 399, 408 [6] [58 Cal.Rptr. 125, 426 P.2d 525], this court said: "As a general rule, res ipsa loquitur applies where the occurrence of the injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both on common knowledge and on expert testimony." (*Tomei* v. *Henning,* 67 Cal.2d 319, 322 [1] [62 Cal.Rptr. 9, 431 P.2d 633].)

■ Thus, in order to be entitled to a res ipsa loquitur instruction, a plaintiff must present some substantial evidence which, if believed by the jury, would entitle it to draw an inference of negligence from the happening of the accident itself.

The initial surgery to remove the possibly cancerous tissues and the medical determination leading to defendant's failure to use a brace or a cast on plaintiff constitute matters which lie beyond the pale of common knowledge of laymen. Although cancer has become a relatively common condition, laymen have no basis for understanding the treatment or symptoms of that disease. Not even the medical profession fully comprehends the cause or proper treatment of cancer. (*Silvers* v. *Wesson,* 122 Cal.App.2d 902, 904-905 [266 P.2d 169]; see Cancer Advisory Council (1965) Cancer, Cancer Quackery and the Cancer Law.)[1] As to the initial operation and defendant's failure to prescribe a brace or a cast, res ipsa would apply only if there were expert testimony which would support such an instruction; but the record completely lacks substantial evidence to support a res ipsa instruction on the basis of expert testimony.

As to defendant's failure to instruct plaintiff that she faced a danger of breaking the leg from lifting it, however, there is considerable common knowledge among laymen upon which a res ipsa instruction might be based. It is just common sense that after removing a substantial portion of a patient's leg bone, a doctor should warn his patient that there is considerable risk to the patient in lifting the leg horizontally until after the healing process has been completed. Neither such a warning nor the break-

---

[1]Thus, legislative findings adopted in 1959 as part of legislation relating to cancer include a statement, "The importance of continuing scientific research to determine the cause or cure of cancer is recognized. . . ." (Health & Saf. Code, § 1700.)

ing of the leg is so uncommon or so complicated that expert testimony would be required in order to render a res ipsa loquitur instruction appropriate. (See *Bardessono* v. *Michels,* 3 Cal.3d 780, 790-791 [91 Cal.Rptr. 760, 478 P.2d 480]; *Wolfsmith* v. *Marsh,* 51 Cal.2d 832, 835-836 [337 P.2d 70, 82 A.L.R.2d 1257].)

Unlike the situation in *Siverson* v. *Weber,* 57 Cal.2d 834 [22 Cal.Rptr. 837, 372 P.2d 97], where the injury was proved to be an inherent risk of the operation, no showing was made here that a leg fracture is an inherent risk of an operation such as was performed on plaintiff if proper precautions are taken. (See *Gerhardt* v. *Fresno Medical Group,* 217 Cal.App.2d 353, 357 [31 Cal.Rptr. 633].)

At the trial there was, as hereinabove indicated, a conflict in the testimony as to precisely what defendant's instructions were. Defendant testified that he told plaintiff "to be very careful and avoid any injury, any violent motions." Plaintiff testified that he told her to be careful and to put only a little weight on the leg. Defendant's own testimony clearly shows that he recognized there was a risk of fracture if proper measures were not taken to support or immobilize the leg *or* instruct plaintiff with respect to the care required. In answering a question as to why he had not placed plaintiff's leg in a cast, defendant stated, "Because, in my opinion, the amount of bone left remaining had sufficient strength to permit her a reasonable amount of activity, *with precaution.*" (Italics added.) With respect to defendant's duty to give adequate instructions to plaintiff in the care she would have to use to avoid injury to her femur, the rationale of *Meier* v. *Ross General Hospital,* 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519], is applicable.

██ Because there was a conflict in the testimony, and sufficient evidence was presented to support an inference of negligence from a failure to give proper precautionary instructions, plaintiff was entitled to have the jury consider the case under the res ipsa loquitur doctrine.

The judgment is reversed.

Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.**—I dissent.

"Since the res ipsa loquitur instruction permits the jury to infer negligence from the happening of the accident alone, there must be a basis *either*

*in common experience or expert testimony* that when such an accident occurs, it is more probably than not the result of negligence. [Citations.]" (*Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633].) (Italics added.)

It must be emphasized at the outset that the majority make absolutely no claim that there is expert testimony in this record upon the basis of which the jury could have drawn an inference of negligence from the mere happening of the accident. They proffer instead the astounding thesis that plaintiff was "entitled to a res ipsa loquitur instruction on the basis of *common knowledge among laymen . . . .*" (Italics added.) I agree that there is no expert testimony to support the required inference of negligence. I emphatically disagree with the majority's conclusion that it can here be based on common experience.

The majority's analysis is in two parts: first, the operation performed by defendant, including his decision not to provide internal or external fixation to plaintiff's leg; and second, defendant's instructions to plaintiff concerning the post-operative use of her leg. As to the first, the majority concede that the medical determinations involved are too complex and too far removed from the knowledge of laymen to be resolved without the aid of expert testimony. In the absence of such testimony in the record, they recognize, as they must, that on this aspect of defendant's treatment, common experience cannot possibly be the basis of the necessary inference of negligence.

In their consideration of the second part, however, the majority strive to reach a different result. Apparently conceding, as I have pointed out, that there is no expert testimony upon which to base the necessary inference and thus to justify a res ipsa instruction, the majority nevertheless hold that the common experience of laymen is sufficient basis for such an instruction. I cannot agree with this conclusion, which lacks any foundation in legal precedent or reality.

The crux of the majority opinion is expressed in a single sentence: "It is just common sense that after removing a substantial portion of a patient's leg bone, a doctor should warn his patient that there is considerable risk to the patient in lifting the leg horizontally until after the healing process has been completed." Essentially this means that, as a matter of law, laymen have the "common sense" to know that a leg from which part of the bone has been removed is likely to break simply by being lifted horizontally. I cannot find any basis for ascribing such knowledge to persons who have no medical training. The characteristics and treatment of bones is a com-

plex and specialized field which requires considerable study beyond that needed to obain a medical degree. Lay persons simply lack the competence to make an intelligent judgment about whether plaintiff faced an appreciable risk of fracture from lifting her weakened leg. "To give a res ipsa instruction under such circumstances invites a purely speculative leap and entrusts the jury with unreviewable power to impose or withhold liability as it sees fit." (*Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 415-416 [58 Cal. Rptr. 125, 426 P.2d 525].) (Tobriner, J., concurring.)

The only support for the majority's conclusion is their statement that "Neither such a warning nor the breaking of the leg is so uncommon or so complicated that expert testimony would be required in order to render a res ipsa loquitur instruction appropriate." This explanation is meaningless. The complexity or simplicity of a warning is irrelevant. The crucial issue is whether a layman has the "common sense" to know if a warning was needed. Nor does the fact that a fracture of the leg is not a rare occurrence establish the result reached by the majority. There are many diseases or conditions of whose existence a layman would be aware but of whose causes he would be wholly ignorant.[1] The question here is whether a lay person has sufficient common knowledge to conclude that lifting a leg whose bone has been partially removed is likely to cause it to fracture. It is manifest that this information is not within the common experience of the average person.

Prior medical malpractice cases in which this court has held that common experience is sufficient to warrant a res ipsa instruction are easily distinguishable. Several have involved routine medical procedures with which most laymen would be personally familiar. *Bardessono* v. *Michels* (1970) 3 Cal.3d 780 [91 Cal.Rptr. 760, 478 P.2d 480] and *Wolfsmith* v. *Marsh* (1959) 51 Cal.2d 832 [337 P.2d 70, 83 A.L.R.2d 1257], both cited by the majority, concerned injuries resulting from injections. In *Wolfsmith* the court remarked: "It is a matter of common knowledge among laymen that injections in the arm, as well as other portions of the body, do not ordinarily cause trouble unless unskillfully done or there is something wrong with the serum." (51 Cal.2d at p. 835.) In *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561], where a rectal abcess developed after a routine presurgical enema was given, we declared: "Although there was no expert testimony as to the probability of negligence in such a situation, it is a matter of common knowledge among laymen that the giving of an enema is not ordinarily harmful unless negli-

---

[1]As the majority point out, "Although cancer has become a relatively common condition, laymen have no basis for understanding the treatment or symptoms of that disease."

gently done." (*Id.* at p. 817.) Certainly, the majority cannot contend that the instant procedure was as routine and commonplace as an injection or an enema.

Other cases where the knowledge of laymen has been held sufficient have involved injuries unrelated to the medical treatment being administered. Where a clamp or sponge was left in a patient's abdomen after surgery, this court has recognized that no medical expertise is necessary in order to infer negligence. (*Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509 [305 P.2d 36]; *Ales* v. *Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409].) The same result has been reached where the patient receives an injury to a portion of the body different from the part being treated. In *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], a patient after undergoing an appendectomy found his shoulder paralyzed. In *Meyer* v. *McNutt Hospital* (1916) 173 Cal. 156 [159 P. 436], plaintiff's legs were badly burned by a hot-water bottle while she was unconscious from the effects of anesthesia. By contrast, in the instant case, the fracture of plaintiff's leg was intimately related to her course of treatment.

The majority treat defendant's statement that "the amount of bone left remaining had sufficient strength to permit her a reasonable amount of activity, *with precaution*" (italics added) as evidence of his recognition of the danger of fracture. Plaintiff also testified that defendant told her to place only a little weight on her leg. Such testimony sheds no light on whether defendant knew or should have known that *the mere lifting of the leg* was likely to cause it to break. The fact that defendant warned plaintiff not to *walk* on her leg by no means indicates that he realized or should have realized the risk inherent in *raising* it slightly while lying down. To suggest that a layman could make an intelligent assessment of this danger from his common experience is to endow him with a medical sophistication acquired by physicians only after many years of training.[2]

---

[2]The majority cite *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519] for the proposition that Dr. Bock had a duty to give plaintiff adequate instructions on how to care for her weakened leg. We there said, "If those charged with the care and treatment of a mentally disturbed patient know of facts from which they could reasonably conclude that the patient would be likely to harm himself in the absence of preclusive measures, then they must use reasonable care under the circumstances to prevent such harm. [Citations.]" (*Id.* at p. 424.)

*Meier* involved wholly different facts from the instant case and provides no support for the majority's conclusion here. The decedent in *Meier* had previously attempted to kill himself and subsequently was hospitalized in the psychiatric wing of defendant hospital. His room on the second floor of the hospital had a fully openable window without any protective bars. When he committed suicide by jumping from the hospital window, his family brought an action to recover damages for wrongful death. We held that a res ipsa instruction was proper, even absent expert testimony, since "the evi-

I would affirm the judgment.

Wright, C. J., concurred.

---

dence supports a conclusion that the cause of the accident (the openable window) was not inextricably bound up in a course of treatment involving the exercise of medical judgment beyond the common knowledge of laymen." (Fn. omitted.) (*Id*. at p. 431.) In the instant case, by contrast, the medical judgment involved was wholly beyond a layman's ken. Consequently, the rationale of *Meier* is inapplicable.